IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION; CONSUMER BRANDS ASSOCIATION; NATIONAL CONFECTIONERS ASSOCIATION; FMI, THE FOOD INDUSTRY ASSOCIATION, <br><br>                Plaintiffs, <br><br>     v. <br><br> KEN PAXTON, in his official capacity as ATTORNEY GENERAL OF THE STATE OF TEXAS, <br><br>                Defendant. | Civil Case No. 6:25-cv-00566 |

## **COMPLAINT**

1.    The safety of the foods and beverages that grace America's family tables is too important to outsource to foreign governments.  Unfortunately, that's exactly what Section 9 of the law at issue in this case, Texas Senate Bill 25, does.  All agree that improving safety and transparency are vitally important goals.  Section 9, however, attempts to accomplish these worthy goals in ways the U.S. Constitution simply does not permit by requiring food and beverage manufacturers to include false and misleading warning labels on products containing any of 44 listed ingredients.

2.    The plaintiffs are trade associations whose thousands of members make, distribute, and sell the foods and beverages that American families put in their grocery carts every day.  These businesses play a critical role in ensuring America's

food security and independence.  They keep grocery shelves stocked with abundant, safe, and affordable foods so that families can make choices that reflect their tastes, diets, and budgets.  And they can succeed only if Americans trust the safety, quality, and labeling of the foods they sell.  That's why plaintiffs have long supported clear, accurate, and uniform labeling standards that empower consumers to make informed choices.  And that's why the United States Food and Drug Administration has long comprehensively regulated the safety—and labeling—of foods and beverages sold in the United States.

3.     In June 2025, Texas enacted Senate Bill 25.  Section 9 of that law undermines those goals, as well as the FDA's uniform regulatory regime, by requiring conspicuous "warning" labels on products containing any of 44 listed ingredients— and also requiring those same warnings to be posted online.  Section 9's warning requirement applies to any product label developed or copyrighted on or after January 1, 2027.  These warnings don't convey determinations made by any U.S.-based health authority, but instead compel a message about purported policy judgments from foreign governments—the European Union, United Kingdom, Canada, and Australia.  Section 9 requires these warnings even though the listed ingredients have been used safely in American foods and beverages for decades.

4.     Section 9's warning requirement compels businesses to tell Texas consumers that the enumerated ingredients are "not recommended for human consumption" abroad—even when that isn't true.  The foreign governments listed in Section 9 don't specifically categorize ingredients as "not recommended for human

consumption." In many instances, all the foreign governments cited in Section 9 affirmatively allow the use of ingredients covered by Section 9. In others, some of the foreign governments Section 9 points to do. That makes the warning label that Section 9 requires false and misleading.

5.     Unsurprisingly, then, Section 9's warning requirement is unconstitutional several times over.

6.     First, Section 9's warning requirement violates the First Amendment by compelling businesses to speak government-scripted messages—and to repeat inaccurate and misleading messages at that. There's no legitimate government interest in forcing businesses to spread false messages to consumers that don't advance safety and transparency.

7.     Section 9 can't withstand strict scrutiny because it isn't narrowly tailored to serve a compelling government interest. It likewise fails every prong of the First Amendment compelled commercial speech test: it's misleading, it doesn't concern a substantial governmental interest, it doesn't directly advance a substantial governmental interest, and it's more extensive than necessary to serve any substantial governmental interest. Failure on any one of those prongs is fatal to Section 9—and it fails all four.

8.     Second, Section 9 is preempted by federal law. Congress designed a system to ensure a uniform, nationwide approach to food labeling. Applying federal law, the FDA already regulates the same ingredients that Section 9 targets. By piling on another layer of inconsistent, state-specific requirements—based on foreign

governments' purported policy judgments, no less—Section 9 directly conflicts with federal law and frustrates Congress's objectives.

9.      Third, Section 9 is void for vagueness.  It contains a provision stating that the law doesn't apply when a federal law or regulation "imposes conditions on the use of the ingredient," "determines an ingredient . . . is safe for human consumption," or "requires a labeling statement relating to ultra-processed or processed foods."  But none of these terms is defined in the statute, and their meaning is subject to several potential interpretations.  Businesses can't know with any reasonable certainty whether their products fall within or outside the scope of Section 9's warning requirement.  They will face severe penalties if they guess wrong, leaving businesses to navigate an unpredictable and shifting regulatory landscape.

10.     Finally, Section 9 violates the dormant Commerce Clause by forcing businesses across the country to change their products or their labels to meet Texas's unique rules.  This overreach disrupts the national market and creates a confusing patchwork of state laws, with burdens that outweigh any local benefits.

11.     Make no mistake, the consequences of Section 9's warning requirement are severe.  It compels speech that is inaccurate and misleading.  It misinforms consumers rather than informing them.  It increases costs for businesses and consumers alike.  And it disrupts the uniform national system that helps ensure American foods and beverages are safe and affordable, and that customers have the accurate information they need to make informed decisions.  If allowed to stand,

Section 9's warning requirement will cause irreparable harm to the First Amendment rights of plaintiffs' members—and impose numerous other unrecoverable harms.

12.    All agree that safe, clearly labeled foods and beverages are of paramount importance. That's why plaintiffs have long supported safety regulations that protect consumers and foster informed choices.

13.    But regrettably (and no doubt unintentionally), Section 9's warning requirement undermines those important goals by mandating false and confusing warnings while sowing regulatory chaos and confusion.

14.    The government is of course free to speak its own messages and express its own views and preferred policies. But the government cannot wield its power to force citizens to speak. It cannot require businesses to affix false and misleading warnings that confuse consumers and upend the economy. And it certainly cannot do so via an impermissibly vague law that interferes with federal regulation and burdens interstate commerce in the process.

## PARTIES

15.    Plaintiff American Beverage Association (ABA) is a nonprofit entity organized under section 501(c)(6) of the Internal Revenue Code. ABA is a trade association that represents and has as members non-alcoholic beverage producers from across the United States. It is incorporated in the District of Columbia and operates in Washington, D.C. ABA's members produce, distribute, and sell products across all 50 states. They bring to market hundreds of brands, flavors, and packages, including soft drinks, bottled water, juices, sports drinks, teas, and energy drinks.

ABA's members strive to strengthen the health of their consumers—including by working to reduce sugar in beverages and providing consumers with the information they need to make the best decisions for themselves and their families.

16.    Plaintiff Consumer Brands Association (CBA) is a nonprofit entity organized under section 501(c)(6) of the Internal Revenue Code.  CBA is a trade association that represents and has as members manufacturers of consumer-packaged goods from across the United States.  It is incorporated and headquartered in Virginia.  CBA champions an industry whose products Americans depend on every day, including packaged food and beverage products.  Its membership plays a vital role in powering the Nation's economy.  Just last year, they contributed $2 trillion to the United States GDP and supported more than 20 million American jobs.  Its members' products are manufactured, distributed, and sold across all 50 states.  On behalf of its members, CBA advocates in support of uniform regulatory frameworks that ensure consumers have access to affordable products and choice in the marketplace.

17.    Plaintiff National Confectioners Association (NCA) is a nonprofit entity organized under section 501(c)(6) of the Internal Revenue Code.  NCA is a trade association that represents the interests of members that produce and market treats like chocolate, candy, gum, and mints across the United States.  NCA is incorporated in Virginia and operates in Washington, D.C.  NCA's members support tens of thousands of well-paying jobs in the manufacturing industry, and they support hundreds of thousands of additional jobs in the agriculture, transportation, and retail

industries.  NCA's members have over 1,600 manufacturing facilities located in all 41 states.  One of NCA's core values is transparency and trust in the Nation's food supply.  NCA is deeply committed to food safety programs and regulations that are transparent, uniform, and science based.

18.     Plaintiff Food Marketplace, Inc. d/b/a FMI, the Food Industry Association, is a nonprofit entity organized under section 501(c) of the Internal Revenue Code.  FMI is incorporated in the District of Columbia and operates in Virginia.  FMI is a trade association that champions the interests of the entire food industry—from the producers that supply food to the retailers that sell it.  FMI's members range from small independent operators to the largest national and international food businesses.  The reach of FMI's work is significant—it represents a $1 trillion industry with over six million employees.  FMI is committed to advancing a safer, healthier, and more efficient consumer food supply chain.

19.     Defendant Ken Paxton is the Attorney General of Texas.  He is sued in his official capacity.  The Attorney General is expressly charged with enforcing Section 9, so he is the proper defendant to this lawsuit.  *See* Tex. Health & Safety Code § 431.0816; *see also Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 400 (5th Cir. 2025) ("statutory duty to enforce the law" links the official "to the reasonably anticipated enforcement").

## JURISDICTION, STANDING, AND VENUE

20.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 because plaintiffs' claims arise under federal law and involve deprivations of rights, privileges, and immunities secured by the United States Constitution.

21.    This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908); injunctive relief under 28 U.S.C. § 1651; and declaratory relief under 28 U.S.C. § 2201(a).

22.    Plaintiffs' associational standing to bring this suit on behalf of their various members is "self-evident." *Sierra Club v. EPA*, 793 F.3d 656, 662 (6th Cir. 2015); *see Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 n.4 (5th Cir. 2019). In the Fifth Circuit, establishing associational standing requires a plaintiff association to "show that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Religious Broads. v. Fed. Commc'ns Comm'n*, 138 F.4th 282, 290 (5th Cir. 2025).  The association must allege that at least one of its members will suffer harm, though "alleging that a specific member exists does not require naming that member." *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 496-97 & n.5 (5th Cir. 2024).

23.    Plaintiffs satisfy the first criterion—standing in their own right— because each of them has at least one member (and in fact many more) that uses ingredients listed in Section 9 and so is directly and adversely affected by Section 9's

warning requirement.  Plaintiffs have specific members that are subject to Section 9's warning requirement because they use the ingredients covered by that compelled-speech requirement.  Moreover, each plaintiff has standing in its own right because it represents the very industry that is subject to the government action at issue.  *Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, 103 F.4th 1097, 1109 (5th Cir. 2024).

24.    As a result of Section 9's warning requirement, those members will be forced to convey the government's preferred viewpoint on their products and websites—an irreparable loss of their First Amendment Rights.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Those members will also incur significant other costs and will be forced to imminently change their business practices to avoid violating the warning requirement.

25.    Plaintiffs also satisfy the second criterion of associational standing, i.e., that the interests plaintiffs seek to protect are germane to their purposes.  Each plaintiff association is committed to protecting the interests of its members, as well as the broader business community, and each regularly advocates for uniform and accurate labels for food and beverage products.  *See NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025) (explaining purpose "to make the Internet safe for free enterprise and free expression" and a lawsuit "centered on doing exactly that" satisfied this requirement).

26.     The third criterion is satisfied because neither the claims asserted, nor the declaratory and injunctive relief sought requires an individual member to participate in the suit. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

27.     Plaintiffs also have standing to bring this case in the form of a pre-enforcement challenge.  In this context, "a plaintiff has suffered an injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'"  *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014)).

28.     This requirement is easily satisfied in the First Amendment context. *See Speech First*, 979 F.3d at 330–31 ("This court has repeatedly held, in the pre-enforcement context, that '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.'").  "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 335.

29.    The Attorney General isn't immune under the Eleventh Amendment because this is a pre-enforcement challenge seeking prospective relief for ongoing violations of federal law—not damages. *See Ex parte Young*, 209 U.S. at 156–60.

30.    Venue is proper under 28 U.S.C. § 1391(b) in the Western District of Texas both because the defendant resides in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs' members conduct substantial business in the Western District of Texas. In the last year, plaintiffs' members sold tens of millions of dollars' worth of products within the Western District of Texas. Over 100,000 products contain one or more of the ingredients covered by Section 9's warning requirement, and so plaintiffs' members will be affected by that warning requirement absent injunctive relief, including in the Western District of Texas.

## BACKGROUND

31.    For generations, Americans have valued their right to choose what foods to eat and how best to feed their families. That freedom depends on appropriate regulation. For many years, the FDA has consistently provided that regulation. But Section 9's warning requirement changes all that by imposing false and misleading labeling requirements on foods and beverages containing ingredients permitted by the FDA.

## I.    Ingredients covered by Section 9 are permitted under federal law.

32.    To ensure the safety of foods and that those foods are appropriately labeled, Congress passed the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq.

The FDCA provides the FDA with authority to "protect the public health by ensuring that . . . foods are safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b)(2)(A). In particular, the FDCA explains that "[a] food shall be deemed to be misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1).

33.    In 1990, Congress passed the Nutrition Labeling and Education Act, Pub. L. No. 101-535, 104 Stat. 2353, which amended the FDCA to establish "uniform national standards for the nutritional claims and the required nutrient information displayed on food labels." H.R. Rep. No. 101-538 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3342; *see In re Whole Foods Mkt., Inc.*, 163 F. Supp. 3d 385, 391 (W.D. Tex. 2016) ("Part of the NLEA's purpose was to create uniform national standards regarding the labeling of food.") (internal quotation marks omitted).

34.    Using this statutory authority, the FDA has established a comprehensive regulatory system for food and beverage labeling. Those regulations benefit consumers and the economy by ensuring nationwide uniformity in food and beverage labeling. As one court has explained, "[i]t is easy to see why Congress would not want to allow states to impose disclosure requirements of their own on packaged food products, most of which are sold nationwide. Manufacturers might have to print 50 different labels, driving consumers who buy food products in more than one state crazy." *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011).

35.     In fact, it's challenging for manufacturers of foods and beverages to comply with individual state labeling requirements because their customers may distribute products into states other than the original destination state.

36.     Under federal law, the FDA may permit ingredients in foods by regulation, whether through a premarket approval process or because ingredients are generally recognized as safe based on established scientific evidence. *See* 21 C.F.R. Parts 73–74, 81–82, 101, 170–73, and 190.6 (premarket approval and implementing regulations); 21 C.F.R. Parts 182–86 (generally recognized as safe). Other ingredients may be generally recognized as safe by food and beverage manufacturers themselves based on established scientific evidence.

37.     Some of the ingredients covered by Section 9 are ***not*** allowed under federal law so they already cannot—and are not—used as ingredients in foods.[1]

38.     The vast majority of the remaining ingredients covered by Section 9 have either been permitted by the FDA through premarket approval or recognized by FDA regulations as safe.[2] In many instances, the FDA has already prescribed how a product containing such an ingredient should be labeled to reflect that the product contains that ingredient.

---

[1] Five of the ingredients listed in Section 9 fall into this category. Partially hydrogenated vegetable oil, red 3, red 4, synthetic trans fatty acids, and DMAA are not permitted by FDA. *See* Ex. A (chart showing status of ingredients in United States and foreign jurisdictions).

[2] Setting aside those ingredients that can't be used, only four ingredients listed in Section 9 fall outside this category: interesterified palm oil, interesterified soybean oil, stearyl tartrate, and toluene.

## II.    Section 9 imposes a new warning requirement that is false and misleading.

39.    Against the backdrop of extensive federal regulation, Section 9's warning requirement conscripts businesses into serving as unwilling messengers for foreign governments' purported policy judgments about everyday food ingredients. In so doing, Section 9's warning requirement compels businesses to make statements that are untrue and misleading, that the government has never independently validated, and that the FDA has in fact *rejected* by permitting nearly all the ingredients it covers.  This threatens a patchwork of state laws that will drive up costs for consumers and make it nearly impossible for businesses to comply with myriad (not to mention conflicting) regulations.

40.    Section 9's warning requirement applies broadly.  It defines "food manufacturer" to include "any manufacturer that offers a food product for sale in this state, regardless of where the product was originally produced." Tex. Health & Safety Code § 431.0815(f).  Section 9's warning requirement extends to food producers across the country and even abroad.

41.    Section 9 amends the Texas Health and Safety Code to require that a "food manufacturer shall ensure each food product the manufacturer offers for sale in this state includes a warning label disclosing the use of any of the following ingredients, if the United States Food and Drug Administration requires the ingredient to be named on a food label and the ingredient is used in a product intended for human consumption." Tex. Health & Safety Code § 431.0815(a).  So if one of the ingredients present in a product must be *listed* on the FDA-mandated

14

"Ingredients" section of the product packaging, Section 9 now compels the food manufacturer to issue a *warning* about that ingredient.

42.    The list of targeted ingredients includes common additives that regulators have long deemed safe for use in the U.S. food supply.  For example, lye has been used in food preparation for centuries to give a distinctive flavor, color, and texture to commonplace foods like pretzels and bagels.

43.    Moreover, Section 9 mandates a specific government-scripted warning. It requires food manufacturers to include warning labels that contain a statement "printed in a font size not smaller than the smallest font used to disclose other consumer information required" by the FDA that reads:  "WARNING: This product contains an ingredient that is not recommended for human consumption by the appropriate authority in Australia, Canada, the European Union, or the United Kingdom."  Tex. Health & Safety Code § 431.0815(b)(1).  This warning must be "placed in a prominent and reasonably visible location" and "have sufficiently high contrast with the immediate background to ensure the warning is likely to be seen and understood by the ordinary individual under customary conditions of purchase and use."  *Id.* § 431.0815(b)(2)–(3).

44.    For products "for sale in this state on the manufacturer's or retailer's Internet website," manufacturers and retailers must satisfy the law by:  "(1) posting a legible statement on the manufacturer's or retailer's Internet website"; or "(2) otherwise communicating the information to" consumers.  Tex. Health & Safety Code § 431.0815(c).

45.    Section 9 suggests that many of the covered ingredients are unsafe, even though they're allowed by federal law—either because they've been specifically permitted by the FDA or are generally recognized as safe.  Section 9 also misleadingly suggests that foreign jurisdictions have categorized the covered ingredients as "not recommended for human consumption" when they have not.  Tex. Health & Safety Code § 431.0815(b)(1).

46.    For 15 of the ingredients covered by Section 9, the required warning is false because Canada, the United Kingdom, European Union, and Australia all permit their use in foods and beverages.[3]  For 17 other ingredients permitted in the United States, Section 9 misleadingly suggests that they're prohibited in *all* of Canada, the European Union, United Kingdom, and Australia when they're actually permitted in some of those jurisdictions.[4]

47.    Section 9's warning requirement will confuse consumers.  Consumers will be led to believe that ingredients permitted by federal law or generally recognized

---

[3]  *See* Ex. A.  Those ingredients are:  acetylated esters of mono and diglycerides, blue 1 (Brilliant Blue), blue 2, butylated hydroxyanisole, butylated hydroxytoluene, diacetyl, diacetyl, diacetyl tartaric and fatty acid esters of mono- and diglycerides (DATEM), interesterified palm oil, interesterified soybean oil, lactylated fatty acid esters of glycerol and propylene glycol, potassium aluminum sulfate, Red 40 (Allura Red), Yellow 5 (Tartrazine), and Yellow 6 (Sunset Yellow).

[4]  *See id.*  Those ingredients are:  anisole, azidocarbonamide, bleached flour, canthaxanthin, citrus red 2, DSS, ficin, green 3, morpholine, potassium iodate, propylene oxide, propylparaben, sodium aluminum sulfate, sodium lauryl sulfate, sodium stearyl fumarate, thidipropionic acid, and titanium dioxide.

Only six of Section 9's 44 listed ingredients are permitted in the United States but can't be used in any of the foreign jurisdictions listed in Section 9.  Those ingredients are:  bromated flour, calcium bromate, olestra, potassium bromate, stearyl tartrate, and toluene.  *See id.*

as safe in the *United States* are unsafe for human consumption. Section 9's warning requirement moreover does not give consumers any information to explain why a food or beverage product bears a warning label.

48.    Section 9 vests exclusive enforcement authority in the Attorney General, who "may bring an action on behalf of this state to enjoin the manufacturer from violating" the law. Tex. Health & Safety Code § 431.0816(a); *see also id.* § 431.0815(e) ("This section does not create a private cause of action for a violation of this section.").

49.    The Attorney General may seek injunctions, impose civil penalties of up to $50,000 per day for each distinct product in violation of the new statutory mandate, and obtain "any other relief that may be in the public interest." Tex. Health & Safety Code § 431.0816.

50.    The Attorney General is also entitled to an "order requiring reimbursement to this state for the reasonable value of investigating and bringing an enforcement action for a violation"—with no statutory language requiring that the investigation be successful. *Id.* § 431.0816(b)(2).

51.    Section 9 includes a "Federal Preemption" provision. Tex. Health & Safety Code § 431.0817. That provision states that "Section 431.0815 has no effect" "[o]n and after September 1, 2025, and the effective date of a federal law or regulation issued by the [FDA] or the United States Department of Agriculture" if:

(1)    for a specific ingredient . . . the law or regulation:

    (A)    prohibits the use of the ingredient;

    (B)    imposes conditions on the use of the ingredient, including a condition requiring a warning or disclosure statement; or

(C)    determines an ingredient or class of ingredients is safe for human consumption; or

(2)    the law or regulation requires a labeling statement relating to ultra-processed or processed foods.

*Id.* None of these terms or phrases are defined.

52.    Section 9 also exempts broad categories of food and products—including restaurant food, retail-prepared food, USDA-regulated products, dietary supplements, and agricultural chemicals from its warning requirement. Section 9 exempts from its scope:

(1)    an ingredient used in a product not intended for human consumption;

(2)    food labeled, prepared, served, or sold in a restaurant;

(3)    food labeled, prepared, or served in a retail establishment.

(4)    a product regulated by the United States Department of Agriculture's Food Safety and Inspection Service;

(5)    a product labeled with a governmental warning with a recommendation from the surgeon general of the United States Public Health Service;

(6)    a drug or dietary supplement; or

(7)    a pesticide chemical, soil or plant nutrient, or other agricultural chemical used in the production, storage, or transportation of a raw agricultural commodity.

Tex. Health & Safety Code § 431.0815(d).

53.    Section 19(b) of the bill provides that the new compelled disclosure provisions apply "only to a food product label developed or copyrighted on or after January 1, 2027." Tex. S.B. 25, § 19(b), 89th Leg. R.S. (2025).

III.    **Section 9's warning requirement imposes immediate and irreparable harms on plaintiffs' members.**

54.    Section 9's warning requirement inflicts immediate, irreparable, and far-reaching injuries on plaintiffs' members.

55.    First, Section 9's warning requirement compels speech in violation of the First Amendment.  The Constitution doesn't permit the government to conscript private businesses to spread its message, particularly when that message is misleading or untrue.  And it's well settled that the constitutional injury arising from a First Amendment violation is per se irreparable.  *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

56.    Second, Section 9's warning requirement inflicts direct and significant economic harm.  Even though the warning requirement doesn't formally take effect until January 1, 2027, plaintiffs' members must begin altering their business practices now.  That means either reformulating foods and beverages entirely or redesigning packaging, revising online disclosures, adjusting supply chains, and implementing costly compliance systems for any products bound for Texas that contain ingredients subject to Section 9's warning requirement.  These burdens will fall especially hard on members headquartered outside Texas, who must overhaul nationwide operations just to serve Texas consumers.  Those expenditures are substantial, unrecoverable, and constitutionally intolerable.

57.    Third, Section 9's warning requirement damages plaintiffs' members' reputations and the goodwill they have built with consumers.  By forcing businesses

to affix stigmatizing, misleading, and false warnings to their products, Section 9 suggests to consumers that ingredients permitted by federal law and used by plaintiffs' members are unsafe, which will erode consumer confidence and trust in products that are safe to consume.  Courts have long recognized that this reputational harm, loss of goodwill, and diminished consumer trust is a classic irreparable injury. *E.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (reputational harms can be concrete injury for standing purposes); *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (injury to "professional reputation" suffices for standing purposes (emphasis omitted)); 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2023) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

58.     Section 9's warning requirement is impermissible and misguided.  The law improperly compels businesses to convey a government-scripted message that is false and misleading.  In so doing, Section 9's warning requirement not only violates the First Amendment but also undermines the careful balance struck by federal food law and deprives businesses of fair notice.

## CAUSES OF ACTION

### COUNT ONE
### 42 U.S.C. § 1983, 28 U.S.C. § 2201, and *Ex Parte Young*
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT

59.     Plaintiffs incorporate the above allegations by reference.

60.    The First Amendment, as incorporated against the states through the Fourteenth Amendment, provides that the government cannot make any law "abridging the freedom of speech."  U.S. Const. amend. I.

61.    The First Amendment protects commercial speech—including the right not to speak.  *See Va. Pharm. Bd. v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976); *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 279 (5th Cir. 2024).  There is broad protection for commercial speech, resting on the notion that "people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Va. Pharm. Bd.*, 425 U.S. at 770.

62.    Section 9's warning requirement directly compels plaintiffs' members to speak, squarely implicating the First Amendment.  The law mandates that food manufacturers convey a government-scripted message on food labels and online, making it a "content-based regulation of speech" that "compel[s] individuals to speak a particular message" and "alte[rs] the content of [their] speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*).  "Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571–72 (2011).

63.    As a content-based speech regulation that compels commercial speech, Section 9's warning requirement is subject to strict scrutiny, meaning it is "presumptively unconstitutional and may be justified only if the government proves

that [it is] narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766.

64.    Section 9's warning requirement can't survive strict scrutiny because it doesn't further a "compelling interest," but even if it did, it's not "narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).

65.    The government doesn't have a compelling interest in forcing businesses to label their products with warnings that certain listed ingredients aren't recommended for human consumption by Australia, Canada, the European Union, or the United Kingdom.

66.    Those governments don't affirmatively categorize ingredients as "not recommended for human consumption." Tex. Health & Safety Code § 431.0815(b)(1). Even if one (or some) of the foreign jurisdictions that Section 9 references doesn't (or don't) allow the use of an ingredient, in 17 instances other foreign jurisdictions permit the use of that ingredient.[5]

67.    The government's interest is particularly weak where, as here, the ingredients are permitted by federal law and are explicitly allowed by FDA regulations or are generally recognized as safe in the United States.

68.    As a threshold matter, the government has no interest in compelling food and beverage manufacturers to convey false information. And with respect to 15 of the ingredients listed in Section 9, the warning required by Section 9 is false on any interpretation. Health authorities in Australia, Canada, the European Union,

---

[5]   *See supra* n.4 & Ex. A.

and United Kingdom all allow the use of 15 ingredients that are listed in Section 9.[6] But Section 9 would nonetheless require a false warning that these ingredients are not recommended for human consumption in these jurisdictions.

69.     The warning requirement in Section 9 is also misleading.  The foreign jurisdictions the law points to don't categorize ingredients as "not recommended for human consumption."  Tex. Health & Safety Code § 431.0815(b)(1).  Section 9's warning requirement likewise misleadingly suggests that an ingredient may be unauthorized for inclusion in food and beverage products in all of the foreign jurisdictions the warning references when it is in fact only unauthorized in some of them.[7]

70.     Nor is Section 9's warning requirement narrowly tailored to achieve any purported public health interest.  As the Fifth Circuit and Supreme Court have recognized, speech regulations aren't the least speech-restrictive means when the government could simply speak for itself.  Here, in contrast to a "prophylactic" rule of compelled speech, the government could "itself publish" the desired warnings "without burdening a speaker with unwanted speech."  *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 213–14 (5th Cir. 2011) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988)).  The government is of course free to publish warnings on its websites, to educate consumers about what it views as the potential harms from ingredients covered by Section 9's warning requirement

---

[6]  *See supra* n.3 & Ex. A.
[7]  *See supra* n.4 & Ex. A.

through a public information or advertising campaign, or to express its message in any number of other ways.

71.    Even if strict scrutiny didn't apply, Section 9's warning requirement violates the First Amendment proscription on compelled commercial speech.  Under the intermediate scrutiny standard that the Supreme Court set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557 (1980), the government cannot regulate non-misleading commercial speech unless it can show (1) a "substantial interest" in regulating the speech; (2) that "the regulation directly advances the governmental interest asserted"; and (3) that the regulation is "not more extensive than is necessary to serve that interest."  *Id.* at 564, 566.  The government's burden to justify its commercial-speech regulations is a "substantial one," *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 70–71 & n.20 (1983), and the government cannot carry it here.

72.    First, as explained above, even assuming Texas has a general interest in protecting the health of its citizens, it doesn't have an interest in forcing businesses to convey a government-scripted message that their ingredients aren't recommended by foreign governments—particularly when those messages are false and misleading.

73.    Second, Section 9's warning requirement doesn't directly advance any government interest.  That's in part because in *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), the Fifth Circuit held that "[c]ompelling sellers to warn consumers of a potential risk never confirmed by any regulatory body—or of a hazard not known to more than a small subset of the scientific community—does not directly

advance the government's interest." *Id.* at 284 (citation and internal quotation marks omitted). The warnings required by Section 9 haven't been adopted by the FDA and aren't congruent with federal law. The foreign governments that Section 9's warning requirement points to haven't uniformly prohibited the use of those ingredients or recommended against them. And the warnings required by Section 9 are in some instances simply false under any interpretation.

74. Setting those problems aside, Section 9's warning requirement attempts to serve any purported public health interest in an impermissibly roundabout way. It relies on multiple speculative steps: assuming consumers notice the government-compelled warnings, hoping consumers are influenced by the views of foreign regulators, anticipating reductions in consumption of the warned-about ingredients as a result (even though the warned about ingredients aren't identified), and presuming that such reduced consumption will actually improve public health, even though most of the disputed ingredients are allowed under federal law (and the ones that aren't allowed aren't in use) and could be consumed by Texans while traveling in other states without any warning. That ripple-effect theory—which necessarily relies on secondary effects of the direct speech regulation—provides only "remote" support for the government's purported purpose. *Central Hudson*, 447 U.S. at 564. And that isn't enough to pass constitutional muster.

75. What's more, there are less speech-compelling alternatives that the government could use to advance any purported interest in public health it asserts that Section 9's warning requirement furthers. Rather than forcing businesses to

deliver government-scripted messages, the government could achieve its objectives by conveying its own messages through its own health agencies. Section 9 doesn't use that alternative (or any others). *See Free Speech Coal.*, 95 F.4th at 284 (noting the absence of "any showing" that the government "tried a government-funded public information campaign or that such a campaign would be ineffective" and "'numerous and obvious less-burdensome alternatives' to the health warnings"). Indeed, the fact that the Legislature seems to have not considered any less burdensome alternatives is fatal under intermediate scrutiny. *See id.*; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 & n.13 (1993).

76.    The exemptions to Section 9's warning requirement further underscore its unconstitutionality. *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999); *see also Dep't of Texas, Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) (en banc) (explaining that "obvious underinclusiveness undermines any argument that Texas is truly interested" in serving its stated interest). Section 9's warning requirement excludes broad categories from its ambit—restaurants, retail-prepared foods, dietary supplements, USDA-regulated products, and agricultural chemicals. Tex. Health & Safety Code § 431.0815(d)(2)–(3), (4), (6)–(7). Moreover, Section 9 carves out labels that exist *today* from its requirements.

77.    These exceptions for broad categories of food that Texans consume every day indicate that the government doesn't have a sufficiently substantial interest in compelling plaintiffs' members to convey Section 9's warnings. Those exceptions also

show that there are less speech-restrictive means than a compelled-speech requirement that the government could use to advance its interests.

78.    The less-stringent scrutiny applied in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), doesn't apply to Section 9's warning requirement because this isn't a case where the government is compelling businesses to convey "purely factual and uncontroversial information." *Free Speech Coal.*, 95 F.4th at 281.  First, none of the foreign governments listed in Section 9 expressly categorize ingredients as "not recommended for human consumption." Tex. Health & Safety Code § 431.0815(b)(1).  Second, in many instances, the compelled speech here is demonstrably false.  Third, the vast majority of the ingredients covered by Section 9 are permitted by federal law, whether through FDA premarket approval or the generally recognized-as-safe process.

79.    But Section 9's warning requirement still forces plaintiffs' members to provide warnings that these ingredients are purportedly unsafe as determined by foreign jurisdictions.  Moreover, the issues of food labeling and food safety are at the center of a national debate and hardly uncontroversial.

80.    Even if *Zauderer* applied, Section 9's warning requirement couldn't withstand that level of scrutiny either.  As the Supreme Court explained in *NIFLA*, even under *Zauderer* a compelled-speech requirement can't be "unjustified or unduly burdensome," and it must remedy a harm that is "potentially real, not purely hypothetical." *NIFLA*, 585 U.S. at 776.  Section 9's warning requirement fails that test because it requires businesses to warn based on the purported views of foreign

regulatory bodies rather than health risks identified by federal law, confuses consumers, and imposes unduly burdensome operational costs on businesses in the process.

81.    By any measure, Section 9's warning requirement impermissibly compels plaintiffs' members' speech in contravention of the First Amendment.

## COUNT TWO
## 21 U.S.C. § 343 and 21 U.S.C. § 343-1
## FEDERAL STATUTORY AND REGULATORY PREEMPTION

82.    Plaintiffs incorporate the above allegations by reference.

83.    Section 9 is preempted by federal law.

84.    A "state claim is preempted where . . . 'state law conflicts with federal law or interferes with the achievement of federal objectives.'" *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004). That is precisely what Section 9 does.

85.    First, section 343(a) of the FDCA provides that "[a] food shall be deemed to be misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1). Section 9 would require plaintiffs' members to place warning labels on foods and beverages where that warning would be false or misleading—putting plaintiffs' members to the choice of either violating the FDCA by placing a statement that is false or misleading on the label or violating Section 9's warning requirement.

86.    Where Section 9's warning requirement forces plaintiffs' members to choose between violating federal law or Section 9, that conflict requires preemption. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617–18 (2011); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 493 (2013).

87.    Second, Congress has established a comprehensive system for labeling artificial colors, artificial flavors, and chemical preservatives, including 21 U.S.C. §§ 343, 348 (food additives), and § 379e (color additives), with detailed implementing regulations in 21 C.F.R. Parts 73–74, 81–82, 101, 170–73, 180, and 190.6. *See Spano as next friend of C.S. v. Whole Foods, Inc.*, 65 F.4th 260, 263 (5th Cir. 2023) (reasoning that the Federal Food, Drug, and Cosmetic Act preempts "state laws implicating labeling requirements found in [21 U.S.C. § 343-1]").

88.    The warning that Section 9 requires targets ingredients extensively regulated by federal law.  Section 343(k) of the federal statute covers "[a]rtificial flavoring, artificial coloring, or chemical preservatives," 21 U.S.C. § 343(k)—exactly the type of food items as to which Section 9 requires an additional warning label. Section 9's warning is also included within 21 C.F.R.'s definition of "label," which "means a display of written, printed, or graphic matter upon the immediate container of any article." 21 U.S.C. § 321(k).  And "labeling" is defined to "mean[] all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

89.    The FDA has approved the use of many of the ingredients covered by Section 9 and has also prescribed how those ingredients should appear on food and beverage labels.  *See, e.g.*, 21 C.F.R. § 172.806 (permitting use of azodicarbonamide, an ingredient covered by Section 9, and explaining labeling requirements); *id.* at § 172.110 (same for butylated hydroxyanisole); *id.* at § 172.115 (same for butylated hydroxytoluene); *id.* at § 74.101 (same for Blue 1).

90.     None of these federal provisions requires any warnings or notices about the recommendations of foreign governments.  By layering on state-law duties rooted in foreign determinations, Section 9's warning requirement impermissibly adds labeling requirements to those already set forth under federal law.

91.     Congress passed the NLEA in part to establish "uniform national standards for the nutritional claims and the required nutrient information displayed on food labels."  H.R. Rep. No. 101-538 (1990); *see also In re: Whole Foods*, 163 F. Supp. 3d at 391 (explaining "part of the NLEA's 'purpose was to create uniform national standards regarding the labeling of food.'").

92.     So Section 9's warning requirement is preempted because Congress has already spoken.  Federal food-labeling law sets uniform national rules so that consumers and manufacturers aren't whipsawed by conflicting state demands.  By forcing food and beverage manufacturers to include Texas-only warning labels in addition to the FDA's labeling requirements—based on the policy judgments of foreign governments no less—Section 9's warning requirement "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" to establish uniform requirements for food and beverage labeling.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

## COUNT THREE
## 42 U.S.C. § 1983, 28 U.S.C. § 2201, & *Ex Parte Young*
## VOID FOR VAGUENESS UNDER THE FOURTEENTH AMENDMENT

93.     Plaintiffs incorporate the above allegations by reference.

94.    The Due Process Clause of the Fourteenth Amendment forbids laws so vague that they fail to give people of ordinary intelligence fair notice of what conduct is prohibited.  *See Winters v. New York*, 333 U.S. 507, 515–16 (1948).  That principle applies with special force where, as here, the law regulates or compels speech.  *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974) (the vagueness doctrine demands "a greater degree of specificity" when it "reach[es] expression sheltered by the First Amendment").

95.    Section 9's warning requirement is unconstitutionally vague.  Its "preemption" provision declares that the statute has "no effect" if a federal law or FDA regulation "imposes conditions on the use of the ingredient," "determines an ingredient . . . is safe for human consumption," or "requires a labeling statement relating to ultra-processed or processed foods."  Tex. Health & Safety Code § 431.0817.

96.    Yet Section 9 doesn't define these crucial provisions.  It offers no guidance on what it means for the FDA to "impose[] conditions on the use of [an] ingredient."  Tex. Health & Safety Code § 431.0817(1)(B).  It doesn't specify what constitutes a federal "determin[ation]" that an ingredient is "safe for human consumption."  *Id.* § 431.0817(1)(C).  And it provides no standards at all for the undefined—and contested—concepts of "ultra-processed" and "processed" foods.  *Id.* § 431.0817(2).

97.    As a result, businesses have no way to know when federal law preempts Section 9's compelled-speech regime, and when they must comply—or face harsh

penalties for noncompliance.  That indeterminacy makes it impossible for plaintiffs' members to conform their conduct to the law—which is the gravamen of an unconstitutionally vague law.  *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (explaining the "void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes" and "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of" government actors).

**COUNT FOUR**
**42 U.S.C. § 1983, 28 U.S.C. § 2201, and *Ex Parte Young***
**VIOLATION OF THE DORMANT COMMERCE CLAUSE**

98.    Plaintiffs incorporate the above allegations by reference.

99.    The Constitution vests Congress with the power to "regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  This affirmative grant of power carries a negative implication:  individual states may not erect barriers or impose regulations that burden interstate or international commerce.

100.    The Supreme Court has long recognized two central limits that the dormant Commerce Clause places on state power.  First, states may not enact laws with "impermissible extraterritorial effect."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 334, 340 (1989) (explaining that "national regulation" is "reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes").  Second, even where a law is not facially extraterritorial, it is invalid if it imposes burdens on interstate commerce

that are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). These rules ensure that trade flows freely in our "national marketplace." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997).

101. Section 9's warning requirement cannot survive this dormant Commerce Clause analysis. Plaintiffs' members manufacture and distribute products across state lines. Their ingredients and packaging come from a global supply chain. Yet Section 9's warning requirement seeks to regulate these out-of-state manufacturers by dictating the warning labels they must affix to products destined for Texas shelves and the government-scripted messages they must convey on their websites. By forcing food businesses outside Texas to alter their speech and their business practices to serve Texas consumers, Section 9's warning requirement exerts the kind of extraterritorial control that the dormant Commerce Clause forbids. *See Healy*, 491 U.S. at 336 (stating that the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State").

102. Section 9's warning requirement also imposes heavy burdens on interstate commerce. Complying with Section 9's novel warning regime will require nationwide businesses to reformulate products and reengineer labeling and distribution systems that serve a national market. And Texas is not alone—other states are already considering or have enacted labeling mandates that would be different from those required by Section 9. That would result in a cascade of conflicting state requirements, leaving food manufacturers in a regulatory thicket

that Congress never authorized and the Constitution forbids. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 338, 348–54 (1977).

103.    Weighed against these burdens, the purported benefits of Section 9's warning requirement are negligble.  Section 9 compels warnings about ingredients that federal law permits and that haven't been shown to pose material risks to human health—even by the foreign nations to which Section 9 purportedly defers.  That imbalance between the burdens on interstate commerce, on one hand, and the purported benefits to Texans, on the other, supplies an additional reason why Section 9's warning requirement violates the dormant Commerce Clause.

**COUNT FIVE**
**42 U.S.C. § 1983 AND 28 U.S.C. § 2201**
**DECLARATORY RELIEF**

104.    Plaintiffs incorporate the above allegations by reference.

105.    In any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  For the reasons articulated above, this Court should exercise its discretion to declare that Section 9's warning requirement violates the First Amendment, Fourteenth Amendment, and the Commerce Clause, and is preempted.

**COUNT SIX**
**EQUITABLE RELIEF**

106.    Plaintiffs incorporate the above allegations by reference.

107.    Federal courts may enjoin state officials' unlawful actions.  28 U.S.C. § 1651; *Ex parte Young*, 209 U.S. at 156–60.  For the reasons articulated above, this

Court should exercise its equitable power to enter an injunction preventing defendant from enforcing Section 9's warning requirement, including against plaintiffs specifically.

## PRAYER FOR RELIEF

108.   For these reasons, plaintiffs respectfully request entry of an order and judgment:

a.     Declaring that Section 9's warning requirement is unlawful, both facially and as applied to plaintiffs and their members;

b.     Declaring that Section 9's warning requirement is unconstitutional under the First Amendment to the U.S. Constitution, as incorporated against the states through the Fourteenth Amendment to the U.S. Constitution, both facially and as applied to plaintiffs and their members;

c.     Declaring that Section 9's warning requirement is preempted by federal law, both facially and as applied to plaintiffs and their members;

d.     Declaring that Section 9's warning requirement is void for vagueness under the Fourteenth Amendment to the U.S. Constitution, both facially and as applied to plaintiffs and their members;

e.     Declaring that Section 9's warning requirement is unconstitutional under the Commerce Clause of the U.S. Constitution, U.S. Const. art. I, § 8, cl. 3;

f.     Preliminarily and permanently enjoining defendant and his subordinates, agents, employees, and all others acting in concert with him from

enforcing Section 9's warning requirement against plaintiffs and their members;

g.    Awarding plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against a state official;

h.    Awarding plaintiffs fees, costs, expenses, and disbursements, including attorneys' fees and costs to which plaintiffs are entitled pursuant to 42 U.S.C. § 1988; and

i.    Awarding plaintiffs and their members all other relief this Court deems just and proper.

Dated: December 5, 2025

Respectfully submitted,

*/s/ Allyson N. Ho*

Allyson N. Ho
   State Bar of Texas No. 24033667
   aho@gibsondunn.com
Benjamin D. Wilson
   State Bar of Texas No. 24084105
   bdwilson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100

Prerak Shah
   State Bar of Texas No. 24075053
   pshah@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
Telephone: (346) 718-6600

*Counsel for Plaintiffs*