# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS WACO DIVISION

AMERICAN BEVERAGE ASSOCIATION;
CONSUMER BRANDS ASSOCIATION; NATIONAL
CONFECTIONERS ASSOCIATION; FMI, THE
FOOD INDUSTRY ASSOCIATION,

        Plaintiffs,

v.

KEN PAXTON, in his official capacity as
ATTORNEY GENERAL OF THE STATE OF TEXAS,

        Defendants.

Civil Case No. _____

**DECLARATION OF AMY BRINK IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

I, Amy Brink, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

    1.    My name is Amy Brink. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements in this Declaration are within my personal knowledge, and I submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

    2.    I am Senior Vice President for Government Affairs at the American Beverage Association (ABA). ABA is a trade association that represents and has as members non-alcoholic beverage producers from across the United States. ABA's members produce, distribute, and sell products across all 50 states. They bring to market hundreds of brands, flavors, and packages, including soft drinks, bottled water, juices sports drinks, teas, and energy drinks. ABA's members strive to strengthen the health of their consumers—including by working to reduce sugar in

beverages and providing consumers with the information they need to make the best decisions for themselves and their families.

3. In my role as Senior Vice President for Government Affairs, I lead government affairs, public policy, and engagement initiatives for ABA throughout the United States, including within Texas. Accordingly, I am familiar with Texas Senate Bill 25 and the effects it will have on ABA's members.

4. Section 9 of Senate Bill 25 covers common ingredients that federal law and the FDA have long permitted for use in foods and beverages in the United States. Based on my knowledge of ABA's members' product portfolios and regulatory histories, the ingredients covered by Section 9 that ABA's members use have been used by the industry for years.

5. ABA's members use the following ingredients covered by Section 9: Blue 1; Red 40; Yellow 5; Yellow 6; Green 3; and DATEM. The colors—Blue 1, Red 40, Yellow 5, Yellow 6, and Green 3—are also "certified food colors by the United States Food and Drug Administration" which is a designation unique to the United States, and covered by Section 9, but is not a designation used in Australia, Canada, the European Union, or the United Kingdom.

6. All these ingredients are expressly permitted by FDA and federal law.

7. As a result of Section 9, ABA's members will be compelled to include Section 9's warning on their product labels and online.

8. But that warning is false, misleading, or both. To my knowledge, none of the European Union, United Kingdom, Canda, or Australia specifically categorize ingredients as "not recommended for human consumption."

9. Blue 1, Red 40, Yellow 5, Yellow 6, and DATEM are also permitted for use in the European Union, United Kingdom, Canada, and Australia—all the jurisdictions listed in Section 9's warning.

10. Green 3 is permitted in some of the European Union, United Kingdom, Canada, and Australia.

11. Because Section 9's warning does not provide any information as to which ingredient contained in a given product triggered the required warning, consumers will be unable to tell what ingredient triggered Section 9's warning.

12. By prescribing the exact words, formatting, and prominence of the required warning label, Section 9 removes ABA's members' editorial discretion over how they present information to consumers.

13. Section 9 also deprives ABA's members of the ability to communicate with their customers and consumers on their own terms. By forcing members to devote limited label space and online real estate to Texas's scripted warning, it crowds other truthful, non-misleading information our members would otherwise provide on their labels and websites to inform consumers about product attributes, sourcing, quality assurances, or other messages they want to convey.

14. Compliance with Section 9 requires significant operational changes. ABA's members must plan redesigned labels, new pre-press, purchase new printing plates and/or graphic files, update product images, and evaluate the feasibility and implications for complex supply chains of attempting to relabel for Texas-bound products that contain the listed ingredients.

3

15. ABA's members must also rewrite and reformat Texas-facing website pages to incorporate the required warning language. And it might not be feasible for digital platforms to distinguish between products for Texas and products for other states unless additional changes (e.g., to UPCs) are made. But changing UPCs would, in turn, generate additional costs including slotting fees for retailers.

16. Due to supplier, warehousing, and supply chain complexities, there is no guarantee that if ABA's members decide to label products for Texas that those products would end up only in Texas. Similarly, system complexity would make it exceedingly difficult to ensure that product not labeled for Texas would remain outside the Texas market. Accordingly, it is likely that Texas labeling would ultimately need to be deployed nationwide at least for some ABA members' products.

17. If ABA's members were to undertake Texas-specific labeling, there would be costs associated with generating segregated inventories, limiting ABA members' ability to respond to volume changes, increase the likelihood of product waste, and possibly result in greater storage costs due to the need for separate inventories.

18. Compliance with Section 9 will additionally require training sales, customer-service, and compliance teams on Texas's new compelled-speech obligations.

19. All these changes impose unrecoverable logistical and operational costs that would collectively run several million dollars.

20. Depending on ABA members' circumstances and portfolios, getting a new, redesigned label onto store shelves would require approximately 6-9 months.

21. Alternately, even if ABA members could reformulate their products that require a warning under Section 9 to remove the ingredients that trigger Section 9's warning—which may not be feasible for a variety of reasons—reformulating products would take significant time and expense and require the development and deployment of new labels.

22. The products ABA's members make and distribute have significant lead times, and production calendars, marketing campaigns, and inventory commitments are set well in advance and cannot be reworked without substantial economic loss.

23. ABA's members frequently change and modify the labels on some of their products to update ingredient or nutritional information, and feature holidays, special events, and other initiatives. Such changes are of interest and benefit to consumers and ABA's members. These types of changes are determined well in advance and require alignment of production calendars, marketing campaigns, and inventory commitments. These changes cannot be modified without substantial economic loss to ABA's members.

24. Section 9's warning also conflicts with ABA's members' guarantees of quality to their customers. Section 9 forces ABA's members to convey messages that are inconsistent with those guarantees, sowing doubt about their integrity and product safety.

25. Displaying Section 9's warning could cause consumers to doubt the integrity and reliability of ABA's members' brands and products. This will harm ABA's members' reputation and decrease the goodwill ABA's members have built with consumers.

26. Once Texas's false warning reaches consumers, the resulting loss of goodwill would be difficult and costly to reverse.

27. ABA is committed to protecting the interests of its members and the broader business community, and we regularly advocate for reforms that reduce unnecessary regulatory burdens on our members. We are committed to transparency, as evidenced by ABA's Clear on Calories initiative in 2010 that let consumers know exactly how many calories are in a beverage before making the purchase by voluntarily committing to placing an easy-to-understand calorie label on the front of every bottle, can, and pack that ABA's members produce. And just this year, ABA launched GoodtoKnowFacts.org, a website where consumers can explore easy-to-understand, fact-based information for more than 140 beverage ingredients. And ABA has specifically advocated for food labeling that provides consumers with accurate, comprehensive nutrition information, as evidenced most recently by ABA's comments to FDA's proposed rule on Front-of-Package Nutrition Information (Docket No. FDA-2024-N-2910).

28. Section 9 has required ABA to devote time and resources to counseling members on compliance options and risks associated with Section 9.

29. There is an ongoing nationwide debate about food safety and food labeling.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 11th day of December, 2025.



Amy Brink

6

DECLARATION OF AMY BRINK