# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS WACO DIVISION

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION; CONSUMER BRANDS ASSOCIATION; NATIONAL CONFECTIONERS ASSOCIATION; FMI, THE FOOD INDUSTRY ASSOCIATION,<br><br>    Plaintiffs,<br><br>v.<br><br>KEN PAXTON, in his official capacity as ATTORNEY GENERAL OF THE STATE OF TEXAS,<br><br>    Defendants. | Civil Case No. 6:25-cv-00566 |

### DECLARATION OF RHONDA BENTZ IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

I, Rhonda Bentz, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  My name is Rhonda Bentz. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements in this Declaration are within my personal knowledge, and I submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.  I am Executive Vice President, Public Affairs of the Consumer Brands Association ("CBA"). CBA is a trade association that represents and has as members manufacturers of consumer-packaged goods from across the United States. It is incorporated in Virginia and operates in Virginia. CBA champions an industry whose products Americans depend on every day, including packaged food and beverage

1
DECLARATION OF RHONDA BENTZ

products. Its membership plays a vital role in powering the Nation's economy. Just last year, the consumer packaged goods industry of which CBA's members are a part, contributed $2.5 trillion to the United States GDP and supported more than 22 million American jobs. CBA's members' products are manufactured, distributed, and sold across the United States. On behalf of its members, CBA advocates in support of uniform regulatory frameworks that ensure consumers have access to affordable products and choice in the marketplace.

3. In my capacity as Executive Vice President of Public Affairs of CBA, I oversee federal and state government affairs and communications and research. I routinely communicate with CBA members, including those with products sold in Texas. My references to CBA members throughout this declaration refer specifically to those CBA members with food and beverage products which are subject to Section 9 of Senate Bill 25.

4. I have read Section 9 of Senate Bill 25 and understand it to encompass 44 ingredients, including ingredients that federal regulators have long permitted as safe for use in the United States. Based on my knowledge of CBA's members' product portfolios and regulatory histories, these ingredients have been widely used for years.

5. CBA's members use the following ingredients covered by Section 9: acetylated esters of mono- and diglycerides (acetic acid ester); azodicarbonamide (ADA); butylated; hydroxyanisole (BHA); butylated hydroxytoluene (BHT); bleached flour; Blue 1 (CAS 3844-45-9); Blue 2 (CAS 860-22-0); bromated flour; Citrus red 2 (CAS 6358-53-8); diacetyl; diacetyl tartaric and fatty acid esters of mono- and

diglycerides of fatty acids (DATEM); Green 3 (CAS 2353-45-9); interesterified palm oil; interesterified soybean oil; lactylated fatty acid esters of glycerol and propylene glycol; lye; potassium bromate; potassium iodate; propylene oxide; propylparaben; Red 40 (CAS 25956-17-6); sodium aluminum sulfate; sodium lauryl sulfate; titanium dioxide; Yellow 5 (CAS 1934-21-0); Yellow 6 (CAS 2783-94-0).

6. Some of the 44 listed ingredients covered by Section 9 of Senate Bill 25 are permitted both in the United States and in all of the foreign jurisdictions listed in Section 9. Other ingredients covered by Section 9 are permitted in the United States and some of the foreign jurisdictions listed by Section 9.

7. As a result of Section 9, CBA's members will be compelled to include Section 9's warning on their product labels and online.

8. But that warning is false, misleading, or both. To my knowledge, none of the European Union, United Kingdom, Canada, or Australia specifically categorize ingredients as "not recommended for human consumption."

9. Because Section 9's warning does not provide any information as to which ingredient contained in a given product triggered the required warning, consumers will be unable to tell which ingredient triggered Section 9's warning. Consumers will also be unable to recognize which foreign authority or authorities triggered the warning.

10. By prescribing the exact words, formatting, and prominence of the required warning label, Section 9 removes CBA's members editorial discretion over how they present information to consumers.

11. Section 9 also deprives CBA members of the ability to communicate with customers on their own terms. By forcing those members to devote limited label space and online real estate to Texas's scripted warning, it crowds other truthful, non-misleading information CBA members would otherwise provide on their labels and websites to inform consumers about product attributes, sourcing, or quality assurances.

12. Compliance with Section 9 requires significant operational changes. CBA members with food and beverage products must plan redesigns, reprints, and relabeling for Texas-bound products that contain the listed ingredients.

13. CBA members must also rewrite and reformat Texas-facing website pages to incorporate the required warning language.

14. CBA members must further reconfigure their inventory-management and warehousing systems to segregate Texas-bound products from those distributed elsewhere.

15. Compliance with Section 9 will additionally require training sales, customer service, and compliance teams on Texas's new compelled-speech obligations. These processes impose unrecoverable logistical costs and millions of dollars in operational costs.

16. Alternately, CBA members must reformulate their products that require a warning under Section 9 to remove the ingredients that trigger Section 9's warning or subject its full product line to Texas' misleading warning. Reformulating products takes many months and requires costly processes, including creating new

4

DECLARATION OF RHONDA BENTZ

product labels and sourcing alternative ingredients, in addition to a wide swath of operational challenges.

17.   Some of CBA members are likely to change product labels and restructure their operations to comply with Section 9. Other members are likely to reformulate their products.

18.   CBA members are already doing this work and therefore bearing these costs. The products they make and distribute have significant lead times, and production calendars, marketing campaigns, and inventory commitments are set well in advance and cannot be reworked without substantial economic loss. The lead time for making changes like these to CBA's members' products can be a year or more.

19.   CBA members frequently change and modify the labels on their products. Reasons that drive these changes are diverse and include but are not limited to: changing product formulation, such as the addition or removal of ingredients, changes in sourcing given supply chain or geopolitical dynamics, or reformulations intended to improve taste, shelf life, cost, or nutritional profile; holiday or event-specific labels that change from year to year; branding strategy, or updates in responses consumer preferences, including updated logos, claims, iconography, or transparency initiatives like clearer ingredient explanations or recycling information or other statements to provide consumers additional clarity. These changes are set well in advance and require alignment of production calendars, marketing campaigns, and inventory commitments. These scheduled changes cannot be modified without substantial economic loss to CBA members.

20. The Section 9 warning also conflicts with CBA members' guarantees of quality to their customers. Section 9 forces CBA members to convey messages that are inconsistent with those guarantees and the statute sows doubt about their integrity and product safety.

21. Displaying Section 9's warning will cause consumers to doubt the integrity and reliability of CBA members' brands and products. This will harm CBA members' reputation and decrease the goodwill CBA members have built with consumers.

22. Once Texas's false warning reaches consumers, the resulting loss of goodwill would be difficult and costly to reverse.

23. CBA is committed to protecting the interests of its members and the broader business community, and we regularly advocate for reforms that reduce unnecessary regulatory burdens on our members. We have specifically advocated for food labeling and food safety reforms on behalf of our members on numerous occasions: the Food Allergen Labeling and Consumer Protection Act (FALCPA), Public Law 108-282 (2004), which amended the Federal Food, Drug, and Cosmetic Act (FD&C Act), Section 403(w) of the FD&C Act, codified at 21 U.S.C. § 343(w); the Food Safety Modernization Act (FSMA) and sub-parts such as Food Traceability Rule (Traceability Rule / FSMA 204), 21 C.F.R. § 1.1325–1.1350; the "Healthy" Nutrient-Content Claim Rule, 21 C.F.R. § 101.65(d); the Use of Salt Substitutes to Reduce the Sodium Content in Standardized Foods—Proposed (NPRM) published by U.S. Food and Drug Administration, 88 Fed. Reg. 21,148 (Apr. 10, 2023); and the pending rule

on Front-of-Package Nutrition Information, 21 CFR Part 101, Docket No. FDA-2024-N-2910, RIN 0910-AI80.

24. Section 9 has required CBA to devote time and resources to counseling members on compliance options and risks associated with Section 9. CBA's members have also already expended time and resources evaluating compliance options and risks associated with Section 9.

25. There is no scientific consensus on the efficacy of mandatory state food labeling regulatory schedules deferring to foreign standards in improving public health and in any case there is no precedent for false and misleading warnings including what Section 9 requires. There is also active dialogue and debate about food safety and food labeling including active review of the USDA/FDA updates to the Dietary Guidelines for Americans; the 2025 yet to be released FDA GRAS (Generally Recognized as Safe) rule, found under RIN 0910-AJ02 and concerning 21 CFR Parts 170 & 570; and the aforementioned pending rule on Front-of-Package Nutrition Information, 21 CFR Part 101, Docket No. FDA-2024-N-2910, RIN 0910-AI80.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 12, 2025.

7

DECLARATION OF RHONDA BENTZ

                                        */s/ Rhonda Bentz*
                                        Rhonda Bentz

8

DECLARATION OF RHONDA BENTZ