# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS WACO DIVISION

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION; CONSUMER BRANDS ASSOCIATION; NATIONAL CONFECTIONERS ASSOCIATION; FMI, THE FOOD INDUSTRY ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>KEN PAXTON, in his official capacity as ATTORNEY GENERAL OF THE STATE OF TEXAS,<br><br>Defendants. | Civil Case No.6:25-cv-00566 |

**DECLARATION OF ELISE FENNIG IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

I, Elise Fennig, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. My name is Elise Fennig. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements in this Declaration are within my personal knowledge and are based on my long experience working with NCA's members. I submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2. I am the Chief of Staff and Senior Vice President of Industry Engagement of the National Confectioners Association (NCA). I know the following to be true from my own personal knowledge. If called upon to do so, I would testify to the following under oath.

3. NCA is a nonprofit trade association consisting of members that produce and market confectionery products, like chocolate, candy, gum, and mints, across the United States,

1

DECLARATION OF ELISE FENNIG

including Texas.  NCA's members have manufacturing facilities in many states, including Texas, and make, distribute, market, and sell chocolate and candy products in all 50 states.

4. NCA represents the interests of its confectionery industry members.  NCA advocates on behalf of its members to ensure that federal, state, and local requirements impacting the confectionery category are transparent, uniform, and science-based.  NCA's core values include transparency to customers and enhancing consumer choice.  NCA members are deeply committed to food safety and work diligently to support trust in the United States food supply.

5. I have reviewed the ingredients listed in Section 9 of Texas's Senate Bill 25.  NCA members market and produce confectionery products that include 21 of the ingredients listed in Section 9, including Acetylated esters of mono- and diglycerides (acetic acid ester), anisole, BHA, BHT, bleached flour, blue 1, blue 2, certified food colors by the U.S. FDA, diacetyl, green 3, interesterified palm oil, interesterified soybean oil, lactylated fatty acid esters of glycerol and propylene glycol, lye, propylparaben, Red 40, sodium lauryl sulfate, titanium dioxide, yellow 5, and yellow 6.

6. Red 3 is also listed in SB 25.  NCA members market and produce products that include Red 3 as an ingredient.  Use of Red 3 in food is decreasing because it will soon no longer be permitted under federal requirements.

7. NCA members manufacture and market products that are sold in Texas and would be subject to Section 9's requirements if any of the ingredients listed in Section 9 are present in such products.

DECLARATION OF ELISE FENNIG

8. Under Section 9, an NCA member company that develops or copyrights a new food label after January 1, 2027, would have to add the warning label if the food contains one of the ingredients listed. NCA members may have to change or revise their product labels if, among other reasons, (1) federal requirements change; (2) ingredients in a product change. Therefore, many NCA members will have to change their labels after January 1, 2027, and comply with Section 9 by adding the warning on products that contain Section 9-listed ingredients.

9. Section 9 would compel NCA members to include a warning about their products that is false and misleading. None of the foreign governments listed in SB 25, including Australia, Canada, the European Union, and the United Kingdom, expressly categorize ingredients as "not recommended for human consumption," and several SB 25 ingredients are expressly permitted for certain uses in food in all four jurisdictions. It is also false and misleading to convey to a consumer that products containing Section 9 ingredients are unsafe. The FDA has either (1) determined that certain Section 9 ingredients are safe, or (2) not challenged the Generally Recognized as Safe status of other Section 9 ingredients as part of its post-market authority.

10. Section 9 also would damage NCA members' reputations and goodwill by compelling them to make false and misleading statements about the safety of their products if they contain one or more of the ingredients listed in Section 9. Compelling such false and misleading information would create consumer confusion and unwarranted fear, resulting in significant reputational and financial damage for NCA members.

11. Compliance with Section 9 will require NCA members to (1) change their labels and update websites, (2) to the extent possible, reformulate products to avoid the warning, (3) avoid distribution in Texas, or (4) do a combination of the foregoing. Any of these options, to the extent

feasible, would be very costly for an NCA member company. For example, it would be extremely difficult, if not impossible, for a manufacturer to ensure that a product without a warning does not reach Texas. Once the product leaves its manufacturer's control and enters distribution channels, the manufacturer is unable to limit where it might be sold and resold, particularly through online channels. Despite exhaustive efforts to control product distribution, a manufacturer may still be liable for non-compliant products that enter Texas commerce. Efforts to manage distribution to comply with SB 25 would require new policies and procedures and training for compliance, sales, and customer service teams. These costs would be in addition to the costs of creating a Texas-compliant label or reformulating products.

12. Reformulation of confectionery products and/or changes to labels take considerable time and resources. Changing existing labels is a significant undertaking and involves art development and redesign, as well as marketing, legal, regulatory compliance reviews; label may have to undergo several design changes until approved. Lead time is also needed for printing, and new designs still might not be used immediately because manufacturers may have a significant inventory of prior labels, which would unnecessarily add to costs if not used. Manufacturers might order a year's worth of label inventory at a time. Product reformulation also requires significant resources and time. Research and development teams must identify alternative ingredients, identify stable, quality sources for those ingredients, obtain the ingredients, test new or modified recipes, contract with suppliers and obtain assurances for adequate supply to meet manufacturing needs, and conduct consumer testing to ensure the reformulated product meets consumer expectations. That said, in some instances, reformulation might not be possible to replace ingredients in confectionery products. For example, color

4

DECLARATION OF ELISE FENNIG

additives must be approved by FDA, and the use of alternative, permissible colors could significantly alter the flavor and character of confectionery products. For example, replacing Red 40 with beet juice or powder may result in unappealing changes to the taste and appearance of a confectionery product that do not meet consumer expectations. The use of such alternatives would also make products more expensive to manufacture and cause supply chain constraints due to less availability and a limited shelf life.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 11, 2025.

_____

Elise Fennig