# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS WACO DIVISION

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION; CONSUMER BRANDS ASSOCIATION; NATIONAL CONFECTIONERS ASSOCIATION; FMI, THE FOOD INDUSTRY ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>KEN PAXTON, in his official capacity as ATTORNEY GENERAL OF THE STATE OF TEXAS,<br><br>Defendants. | Civil Case No. 6:25-cv-00566 |

**DECLARATION OF FMI, THE FOOD INDUSTRY ASSOCIATION IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

I, Doug Baker, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. My name is Doug Baker. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements in this Declaration are within my personal knowledge, and I submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2. I am Vice President, Industry Relations for FMI, the Food Industry Association ("FMI") and have more than 40 years' experience working in the food industry, including my time with FMI. FMI is a trade association that works with and on behalf of the entire food industry to advance a safer, healthier and more efficient consumer food supply. FMI brings together a wide range of members across the value chain—from retailers who sell to consumers, to producers

who supply the food, as well as the wide variety of companies that provide critical support services—to amplify the collective work of the industry.

3. FMI's members include nearly 1,000 supermarket member companies that collectively operate almost 33,000 food retail outlets and employ more than 6 million workers. The average number of stock-keeping-units (SKUs) among those members has held steady for several years and in 2024 was 31,795.

4. In addition to carrying national brand products, many retailers manufacture or co-pack their own private brands, which often serve as a more affordable option since they generally do not invest in significant marketing and advertising to promote these products. The Section 9 labeling requirement will hit private brands particularly hard.

5. Food retailing is a fiercely competitive industry and, with razor-thin profit margins (the average margin was 1.7% in 2024), food retailers have little ability to absorb additional regulatory and compliance burden without having to pass those costs on to consumers. Additionally, regulatory burden impedes innovation, including grocer efforts focused on health and well-being. For example, in a 2025 operations survey by FMI, food retailers said they reinvested in the in-store shopping experience last year, slating more space for more affordable private brands and health-focused products.

6. Section 9 of Senate Bill 25 covers common ingredients that federal law and the FDA have long permitted for use in foods and beverages in the United States. Based on my knowledge of FMI members' product portfolios and regulatory histories, these are ingredients that have been widely used for years. For example, lye (also known as sodium hydroxide, a naturally occurring substance) gives pretzels their crust and unique flavor and is essential for

making masa, used in tamales, tortillas and sopas. Other ingredients on the list, for example, keep salad dressings from separating and keep bakery products fresh on the shelves. Covered ingredients also preserve stability and freshness, reducing spoilage and waste and allowing for a wider variety of foods to be available year-round. Shelf-stable foods are crucial for rural consumers with limited access to grocery stores and consumers in climates with higher rates of spoilage.

7. Of the food and beverage products with coded ingredient statements, more than 100,000 items contain one or more of the list of 44 ingredients specified.

8. FMI's members use the following ingredients covered by Section 9: (1) acetylated esters of mono- and diglycerides (acetic acid ester); (2) anisole; (3) azodicarbonamide (ADA); (4) butylated hydroxyanisole (BHA); (5) butylated hydroxytoluene (BHT); (6) bleached flour; (7) blue 1 (CAS 3844-45-9); (8) blue 2 (CAS 860-22-0); (9) bromated flour; (10) canthaxanthin; (11) certified food colors by the United States Food and Drug Administration; (12) citrus red 2 (CAS 6358-53-8); (13) diacetyl; (14) diacetyl tartaric and fatty acid esters of mono[1] and diglycerides (DATEM); (15) dioctyl sodium sulfosuccinate (DSS); (16) green 3 (CAS 2353-45-9); (17) interesterified palm oil; (18) interesterified soybean oil; (19) lye; (20) olestra; (21) potassium aluminum sulfate; (22) potassium bromate; (23) potassium iodate; (24) propylene oxide; (25) propylparaben; (26) red 3 (CAS 16423-68-0); (27) red 40 (CAS 25956-17-6); (28) sodium aluminum sulfate; (29) sodium lauryl sulfate; (30) thiodipropionic acid; (31) titanium dioxide; (32) yellow 5 (CAS 1934-21-0); and (33) yellow 6 (CAS 2783-94-0).

9. As a result of Section 9, FMI's members will be compelled to include Section 9's warning on their product labels and online.

10. But that warning is false, misleading, or both. To my knowledge, none of the European Union, United Kingdom, Canada, or Australia specifically categorize ingredients as "not recommended for human consumption."

11. Because Section 9's warning does not provide any information as to which ingredient contained in a given product triggered the required warning, consumers will be unable to identify which ingredient triggered Section 9's warning and, as a result, the warning may additionally mislead consumers into thinking that ingredients that do not trigger the warning requirement are unsafe.

12. By prescribing the exact words, formatting, and prominence of the required warning label, Section 9 removes FMI members' editorial discretion over how they present information to consumers.

13. Section 9 also deprives FMI members of the ability to communicate with customers on their own terms. By forcing those members to devote limited label space and online real estate to Texas's scripted warning, it crowds other truthful, non-misleading information FMI members would otherwise provide on their labels and websites to inform consumers about product attributes, sourcing, or quality assurances.

14. FMI members are deeply invested in improving nutrition, health, and well-being. Grocery stores may serve as full-service health and wellness destinations, providing registered dietitians in stores, personalized nutrition guidance, food-as-medicine programs, and an ever-expanding assortment of nutritious products. Grocery stores often serve as the primary source of information about the products they sell for their customers and will be responsible for fielding questions and helping educate consumers about the Section 9 warning, a near impossible task in

light of the reference to foreign jurisdictions' regulatory decisions, lack of clarity about which ingredient triggered the warning, and the fact that most of the covered ingredients are permitted by FDA. This is likely to compound consumer confusion and frustration in stores.

15. Compliance with Section 9 requires significant operational changes, starting with packaging redesign but extending well beyond that.

16. FMI members make strategic business decisions about when to update labels in order to minimize costs and avoid business disruption. They consider factors like label inventory and the seasonality of their products (e.g., some products sell more in Spring, some in the Fall, others during the holidays).

17. Labeling changes take time. For some brands, a label change could take months.

18. The cost of a label change is significant. Associated costs include creative design, product images, regulatory compliance review, packaging material, development of plates that are used to print on the package, and printing. We have received estimates that the average cost could be as high as $9000-$10,000 per label, depending on the extent of the redesign required. This accounts for the steps and costs noted above and varies based on such factors as whether logos need to be moved, whether photography needs to be updated, and the size and material of the packaging for a particular product.

19. Adjusting a label for just one limited market, which Section 9's warning would require, is even more costly, and in some cases is simply not feasible. For example, for a label being run on one manufacturing line, a changeover would increase production time by as much as 6 hours per day.

DECLARATION OF DOUG BAKER

20. But even these costs tell only part of the story. A brand could experience obsolescence if it is required to create a unique package and plates to serve a limited market, in this case Texas only. That brand may lose the economic advantage of purchasing at volume and may no longer be able to satisfy manufacturers' volume minimums. This increases costs, but it may also result in the product no longer being available for sale in Texas, temporarily or permanently.

21. FMI's members must also rewrite and reformat Texas-facing website pages to incorporate the required warning language.

22. FMI's members strive to run efficient supply chains to remove unnecessary costs to keep prices as low as possible for consumers. Section 9 will force brands to reconfigure their inventory-management and warehousing systems to segregate Texas-bound products from those distributed elsewhere. This could result in having to secure additional warehouse space, limiting inventory on faster-moving items, creating more out-of-stocks during critical selling periods, or brands choosing to stop shipping a product to Texas if the volume doesn't warrant the additional cost.

23. Compliance with Section 9 will additionally require FMI members to train team members in customer service, and compliance teams on Texas's new compelled-speech obligations. These logistical and operational steps could cost millions of dollars, amounts that are unrecoverable.

24. Alternately, FMI's members may be forced to reformulate their products that require a warning under Section 9 to remove the ingredients that trigger Section 9's warning. Reformulating products, including creating a new product label, and extended research and

development, is a costly process and can take anywhere from 9–20 months. Brands that are co-packed (retailer brands, small emerging brands) are required to meet specific minimum volume requirements to produce their product. As a result of having to carve out Texas-specific volume, brands that are co-packed may no longer meet those minimum volume requirements, impacting consumer choice.

25. Some of FMI's members are likely to change product labels and restructure their operations to comply with Section 9, at significant cost. Others are likely to discontinue items or reformulate products, also at significant cost.

26. FMI's members are already doing this work and therefore bearing these costs. The products they make and distribute have significant lead times, and production calendars, marketing campaigns, and inventory commitments to produce a product are set well in advance and cannot be reworked without substantial economic loss.

27. Section 9's warning also conflicts with FMI's members' commitments to transparency and quality for their customers. In particular, because the grocery store is where consumers interact with retail staff, FMI's grocery members will be harmed. Food safety is the top priority of the food industry, and retailers invest significantly in educating customers with nutrition and ingredient information and are on the frontlines of distributing information at the point of purchase. Because Section 9 forces FMI's members to convey messages that are inconsistent with those commitments, the statute sows doubt about their integrity and product safety.

28. Displaying Section 9's warning on a product will cause consumers to doubt the integrity and reliability of FMI members' brands and products more broadly, even if those

products don't carry the Section 9 warning. This will harm FMI's members' reputation and decrease the goodwill FMI's members have built with consumers. Once Texas's false and misleading warning reaches consumers, the resulting loss of goodwill will be difficult and costly, if not impossible, to reverse.

29. FMI is committed to protecting the interests of its members and the broader business community, and we regularly advocate for reforms that reduce unnecessary regulatory burdens on our members. We have specifically advocated for food labeling and food safety reforms on behalf of our members on numerous occasions, including through the development of the Facts-up-Front program which allows companies to share nutrition information in a consistent way on the front of a package. As noted, and in fact, 82% of FMI members who responded to an FMI annual operations survey said they employ dietitians and distribute critical information around health and well-being and food safety.

30. Section 9 has required FMI to devote time and resources to counseling members on compliance options and risks associated with Section 9.

31. There is no scientific consensus on the efficacy of the kind of mandatory food labeling required by Section 9 in improving overall public health. While the products that FMI members produce and sell are safe and contain ingredients permitted by FDA, there is also an ongoing nationwide debate about food safety and food labeling.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 12, 2025.

_____
Doug Baker