IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| AMERICAN BEVERAGE ASSOCIATION; CONSUMER BRANDS ASSOCIATION; NATIONAL CONFECTIONERS ASSOCIATION; FMI, THE FOOD INDUSTRY ASSOCIATION,<br><br>Plaintiffs,<br><br>KEN PAXTON, in his official capacity as ATTORNEY GENERAL OF THE STATE OF TEXAS,<br><br>Defendant. | Case No. 6:25-CV-00566-ADA-DTG<br><br>**BRIEF AMICUS CURIAE OF GOLDWATER INSTITUTE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The author of Section 9 has candidly admitted that its purpose is not to fully inform consumers, but to manipulate them and indirectly control how beverage companies operate. She has said that the goal of the mandatory "warning" is to get "food manufacturers [to] remove the harmful [sic] ingredients and choose not to have to label their products," as opposed to seeking to ensure that consumers are fully informed. Dietrich Knauth, *Food Industry Groups Sue Texas Over Ingredient Warning Labels*, Reuters (Dec. 8, 2025).[1]

But that is not what *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), allows. That case says the government may require disclosure of truthful information that is designed to fully inform

---

[1] https://www.reuters.com/legal/government/food-industry-groups-sue-texas-over-ingredient-warning-labels-2025-12-08/.

consumers. It does not exist to allow the government to manipulate consumers or businesses by presenting information in a biased or misleading way. As the Fifth Circuit has put it, *Zauderer* has no application where the compulsory statement, instead of being objectively factual, concerns "a live, contentious political dispute." *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 881 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 592 (2024) ("*Reynolds II*").

Here, the mandatory disclosure raises a live political dispute. Specifically, Section 9 takes sides in a controversy over food additives that the United States government has deemed safe but which certain foreign regulatory bodies have restricted or banned. This controversy among governmental regulatory authorities regarding the safety of these additives, despite U.S. approval, places Section 9 outside the class of compelled speech that *Zauderer* authorizes.

## I. The compelled speech here fails under the *Zauderer* test.

*Zauderer* held that the government may force businesses to speak only in extremely limited circumstances: to convey truthful and noncontroversial information to ensure that consumers have the whole picture. Far from being a catch-all excuse for government to impose speech mandates on businesses, *Zauderer* imposes serious limits on government's power to require "disclosures." Specifically, a *Zauderer* disclosure must be (1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome. *R.J. Reynolds Tobacco*, 96 F.4th at 877. Part of the "purely factual" prong is the requirement that the speech a business is forced to engage in must also be non-misleading, and most importantly, must not represent

an attempt "to simply frighten consumers or to otherwise attempt to flagrantly manipulate the emotions of consumers." *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 529 (6th Cir. 2012). Section 9 fails this test.

> A. ***Zauderer*** **does not authorize the government to compel speech in an effort to manipulate.**

While requiring businesses to disclose information to consumers may appear beneficial, mandating disclosures can be manipulative if the compelled speech results in a false or misleading impression. Consider, for example, the mandatory disclosure that was found unconstitutional in *Cook v. Gralike*, 531 U.S. 510 (2001). There, the state of Missouri required all candidates for Congress to state prominently on the ballot next to their names whether or not they supported legislation to impose term limits for the House of Representatives. That mandate required only the disclosure of objectively true information, and such information might indeed help inform voters. Yet it was obviously an attempt to *manipulate* voters, by focusing their attention on this one subject and thereby "imply[ing] that the issue 'is an important—perhaps paramount—consideration in the citizen's choice.'" *Id*. at 525 (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)). The purportedly objective disclosure requirement was, in truth, an attempt to influence voters by giving them only part of the story.

Similarly, in *National Association of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023), California attempted to impose a warning label requirement on wheat products stating that glyphosate causes cancer—even though federal agencies and other entities had concluded that this was not true. *See id*. at 1279.

3

The warning, said the court, "does reference the scientific debate, and provides literally true statements … [but] still improperly 'elevates one side of a legitimately unresolved scientific debate.'" *Id*. (citation omitted).  The disclosure included "scientific statements that a federal regulatory agency viewed as false"—statements that "although mostly factually true" involved "several misleading omissions which left the 'overall impression ... that [the product was] dangerous and that [it had] somehow escaped the regulatory process.'" *Id*. at 1279-80 (citation omitted).

Finally, in *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012) ("*Reynolds I*"), the D.C. Circuit held that the FDA could not compel cigarette companies to cover their packages with repulsive photographs of diseased lungs, because although this was factual information, it was nonetheless designed to manipulate consumers rather than to inform them.  The requirement went beyond "pure attempts to convey information," and were instead "unabashed attempts to evoke emotion (and perhaps embarrassment) and browbeat consumers into quitting." *Id*. at 1217.[2]

By contrast, last year, the Fifth Circuit upheld a different set of cigarette labeling requirements because "[u]nlike the images [in *Reynolds I*] … these images … are not 'primarily intended to evoke an emotional response' but instead to draw

---

[2] The D.C. Circuit also held that *Zauderer* did not authorize compelled disclosures except to correct potentially misleading statements by the business.  That aspect of the case was later overruled in *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22–23 (D.C. Cir. 2014).  But the *Am. Meat Inst.* decision did not disturb the portion of *Reynolds I* which held that *Zauderer* doesn't allow government to use disclosures as a means of emotional manipulation.

4

attention to the warning and depict a possible medical consequence of smoking. Thus, at most, the emotional response of viewers is incidental to their retention of information about the health risks." *Reynolds II*, 96 F.4th at 880 (citation omitted). The labeling requirements conveyed "useful and factual" information in order to "alleviate information asymmetry regarding the harms tobacco causes and consumers' suboptimal awareness of and response to those harms." *Id.* at 886.

      Here, the disclosure is not about alleviating information asymmetry or providing consumers with "useful" data. Rather, Section 9 requires the inclusion of cherry-picked information, in an attempt to *influence* consumers, rather than protect them through full and balanced information. Section 9 does not require companies to disclose the views of the health agencies of, say, France, India, Italy, South Korea, or Brazil—or, of course, the United States itself—only Australia, Canada, the E.U., and the U.K.  The reason for this selectivity is obvious: to ensure that the state's preferred message is conveyed—as opposed to giving consumers useful data to alleviate information asymmetry.  This case is therefore much more like *Bonta*—it involves a state's effort to convey only selected information in a manner as to give the "overall impression" that the Plaintiffs' products are "dangerous and that they have somehow escaped the regulatory process," irrespective of the truth that they have not. 85 F.4th at 1280.  That falls outside of *Zauderer*.

## B.     "More information" is sometimes an excuse to manipulate.

Even where the government may not intend to manipulate people, compelling disclosure of information can sometimes have that effect. For one thing, people are often unaware of how to make use of information the law requires others to give them. *See* Omri Ben-Shahar & Carl E. Schneider, *The Failure of Mandated Disclosure*, 159 U. Pa. L. Rev. 647, 676–78 (2011). As a result, they often make worse decisions, rather than better ones, when the government requires disclosure—whether in the context of medical treatment, legal advice, products liability, environmental risks, or other things. *Id.* at 727.

Professor Volokh gives a vivid example. In the 1990s, the makers of Ken's Foods salad dressing petitioned Massachusetts to remove acetic acid—that is, vinegar—from its list of toxic substances because acetic acid is an ingredient in dressing, and "[w]hile acetic acid may be harmful in some forms, as a component of salad dressing it is not harmful to human health—and may be beneficial, since it makes lettuce taste better and thus increases the consumption of salad." Alexander Volokh, *The Pitfalls of the Environmental Right-to-Know*, 2002 Utah L. Rev. 805, 824. Compulsory disclosure could harm public health by deterring people from eating vegetables. Likewise, litigants in California sued to compel the disclosure of the possibility that fish may have traces of mercury in it, even though the amounts involved were infinitesimally small, and disclosure of that information may cause people to eat far less healthy food instead of fish—thus, again, proving counterproductive. *Id.* at 825–26.

6

Information scholars often characterize these outcomes as examples of the "availability bias" or "availability heuristic," whereby people who receive information about a potential risk overestimate the likelihood or impact of that risk, simply because the information is "available"—i.e., can be readily imagined.  Paula J. Dalley, *The Use and Misuse of Disclosure as a Regulatory System*, 34 Fla. St. U. L. Rev. 1089, 1114 (2007).  The classic example is plane crashes, which are rare, but highly publicized, leading some consumers to fear plane crashes more than car crashes, which are vastly more likely.

A related phenomenon is the "affect" heuristic, which refers to the way people who feel strong emotions in relation to a perceived risk will overestimate that risk relative to other more likely threats that lack that emotional punch.  *See* Thorsten Pachur & Ralph Hertwig, *How Do People Judge Risks: Availability Heuristic, Affect Heuristic, or Both?,* 18 J. Experimental Psych. 314, 315–16 (2012).  Terrorist attacks, for example, cause emotional trauma that leads people to overestimate their likelihood.

For these and other reasons, Ben-Shahar and Carl Schneider observe in their comprehensive article on the subject that "mandated disclosure repeatedly fails to accomplish its ends."  *Supra* at 665.  *See also* Lear Jiang, *Note: Disclosure's Last Stand? The Need to Clarify the "Informational Interest" Advanced by Campaign Finance Disclosure*, 119 Colum. L. Rev. 487, 501–06 (2019) (observing that the "informational interest" theory must address problems of informational overload and bias).

Such biases can be exploited in ways that harm the public. Professor Sunstein observes that political leaders often attempt to take advantage of the "availability bias" and other biases. He calls these actors "availability entrepreneurs" because they "attempt to trigger availability [biases] likely to advance their own agendas." Cass R. Sunstein, *Risk and Reason: Safety, Law, and the Environment* 92 (2002). By "fixing people's attention on specific problems, interpreting phenomena in particular ways, promoting group polarization, attempting to raise the salience of certain information," and so forth, they seek to distract the public from an objective assessment of the costs and benefits of policy proposals. *Id.*

Moreover, the very fact that information is mandatorily disclosed can itself distort the recipient's processing of that information, by giving it undue emphasis. Information about "who is speaking"—like other kinds of information—may be true in itself, but forcing it onto the stage of a public debate can make it appear more significant than it actually is—especially when its compulsory disclosure is done in a manner that implies that it reveals some wicked motivation on the speaker's part. Someone asked to decide between X and Y is likely to give undue weight to evidence about X's supporters when the form of its disclosure gives the impression that they are operating for a deceptive purpose. *See* Richard A. Epstein, *Behavioral Economics: Human Errors and Market Corrections*, 73 U. Chi. L. Rev. 111, 131 (2006) ("by putting the government into the fray, there is always the risk that debiasing will take the form of rebiasing, by overstating … risks.").

8

An additional danger is "information overload"—the phenomenon whereby a person receives so much information that the person is incapable of making effective use of it or placing it in context. *See, e.g.,* Kenneth Einar Himma, *The Concept of Information Overload: A Preliminary Step in Understanding the Nature of a Harmful Information-Related Condition,* 9 Ethics & Info. Tech. 259 (2007); Thomas Rachfall, et al., *The Information Overload Phenomenon: The Influence of Bad and (Ir)relevant Information*, 3 Int'l J. Research in Eng'g & Tech. 27 (2014). Information overload can also cause people to tune out valuable information because they simply become tired of hearing so much. Anyone who has tossed aside the lengthy disclaimer forms attached to many consumer products knows what this is like. All these risks are heightened in today's climate, in which conspiracy theories and misinformed distrust of safe food and medicine are becoming commonplace. The exploitation of disclaimers to give the impression of a shadowy conspiracy of manipulative forces ("Big Pharma" or "Big Food") is so common as to now present a serious threat to the nation's health.

## II. Section 9 does not "tell the whole story" but implies a totally different story.

The author of Section 9 has made clear that its purpose is not to inform consumers but to manipulate their behavior and that of beverage makers: "With this legislation," she said, "I am hopeful that food manufacturers will remove the harmful ingredients and choose not to have to label their products." Knauth, *supra*.

But that's not what *Zauderer* disclosures are for. *Zauderer* permits compelled speech only to make sure that businesses tell the whole story—*not* as a

9

regulatory tool. As the Fifth Circuit put it, disclosures fall within *Zauderer* only if they are designed in such a way as to be taken literally, are intended to convey truthful information in a dispassionate manner, and "where the inherent nature of the subject [does not] raise[] a live, contentious political dispute." *Reynolds II,* 96 F.4th at 880–881.

Section 9 fails that test. The whole reason for invoking the determinations of Australia, Canada, the E.U., and the U.K., is because the determination of the United States government is different, and the state wishes to contest that determination through the indirect means of influencing consumers through a (false) impression. That's obviously a live, contentious political dispute.

In other words, Section 9 operates not through consumers "retention of information about the health risks" of ingredients, but through making them incorrectly believe that the ingredients are harmful and that this fact is somehow being kept from them by the federal government. *Reynolds II,* 96 F.4th at 880. That is manipulation, not information.

Section 9, in short, is not about telling the whole story, but about telling consumers a *new* story: that is, that products are unsafe in the eyes of foreign government agencies, and implying that the United States federal agencies responsible for public health regulation are somehow complicit and "in on it." The purpose isn't to inform the public but to manipulate its behavior and ultimately, control manufacturers.

## CONCLUSION

Exposing Section 9's constitutional flaw, its author has admitted its purpose is to manipulate manufacturers into reformulating products, not to inform consumers. *Zauderer* permits compelled speech only to ensure consumers receive the whole story—not to manipulate them with cherry-picked information.

By selectively requiring disclosure of only certain foreign regulatory positions while omitting the contrary position of the United States government, Section 9 creates the false impression that ingredients are harmful and federal agencies are concealing this from the public. The law "improperly elevates one side of a legitimately unresolved" dispute among government authorities and thereby raises "a live, contentious political dispute" placing it outside *Zauderer's* narrow exception.

Because Section 9 compels speech that is neither purely factual nor noncontroversial, and that is designed to manipulate rather than inform, it violates the First Amendment. The preliminary injunction should be *granted*.

Respectfully submitted on December 16, 2025.

/s/Warren V. Norred
Warren V. Norred
State Bar of Texas No. 24045094
**NORRED LAW, PLLC**
515 E. Border St.
Arlington, Texas  76010
(817) 704-3984
wnorred@norredlaw.com
*Attorney for Amicus Curiae
Goldwater Institute*

CERTIFICATE OF SERVICE - I hereby certify that on December 16, 2025, an electronic copy of the foregoing brief was filed with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record by email, including:

    Zachary Berg at zachary.berg@oag.texas.gov, and
    Steven Loomis at steven.loomis@oag.texas.gov,
    for Defendant Ken Paxton;

    Allyson Newton Ho at aho@gibsondunn.com,
    Prerak Shah at pshah@gibsondunn.com, and
    Benjamin D. Wilson at bwilson@gibsondunn.com,
    for Plaintiffs American Beverage Asso., Consumer Brands Asso., Food Marketplace, Inc., and National Confectioners Asso.

                                              <u>s/Warren V. Norred/</u>
                                              Warren V. Norred